**S. Brian WILLSON, Holley Rauen, David Duncombe, Duncan Murphy, and Michael Kroll, Plaintiffs,**

v.

**Lonnie F. CAGLE, John M. Banta, Clayton Y.K. Ching, Edward W. Hubbard, Ralph Dawson, David Humiston, and Robert Mayfield, Defendants.**

No. C–88–0328 RFP.

United States District Court,
N.D. California.

Sept. 22, 1988.

See also, 694 F.Supp. 713.

Thomas Steel, Law Offices of Thomas Steel, APC, Doron Weinberg, Larson & Weinberg, Mark Coby, San Francisco, Cal., Linda Fullerton, Point Richmond, Cal., A.J. Kutchins, Berkeley, Cal., for plaintiffs.

Paul Wolfe, John Penrose, Asst. U.S. Attys., Anne B. Nash, Jeffrey J. Parish, Rosenblum, Parish & Bacigalupi, San Francisco, Cal., John M. Kelson, Malcolm Sher, Wilson, Sher, Marshall & Peterson, Paul A. Elizondo, King, Johnson & Shapiro, Oakland, Cal., Jerry K. Cimmet, William F. Murphy, Eric L. Nordskog, Dillingham & Murphy, San Francisco, Cal., Arthur Leinwohl, Foster City, Cal., for defendants.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS

PECKHAM, Chief Judge.

### INTRODUCTION

The parties in this action all participated in the events that lead up to a tragic incident at the Concord Naval Weapons Station on September 1, 1987. On that date, a munitions train operated by employees of the United States Navy collided with a group of demonstrators outside of the weapons station. The plaintiffs in this action seek to recover for personal injuries they received as a result of that collision.

The defendants, who are being sued in their individual capacities, were all either officers or employees of the United States Navy at the time of the incident. Captain Lonnie F. Cagle was the commanding officer of the weapons station. John M. Banta was the station's security manager. Commander Clayton Y.K. Ching was the public works officer at the station, responsible for overseeing railroad operations. Edward Hubbard was employed at the station as the railroad operation foreman. The crew of the train involved in the collision was composed of David Humiston, as engineer, Ralph Dawson, as conductor, and Robert Mayfield, as brakeman.

The complaint sets forth eight causes of action against each of the seven defen-

dants. The first three causes of action are based on *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which allows suits against federal officials individually for damages caused by the officials' violation of federally-protected rights. Count one of the complaint alleges that the defendants violated the plaintiffs' First Amendment rights to freedom of association, free speech, and peaceful assembly, and to petition their government for a redress of grievances. Count two alleges that the defendants violated the plaintiffs' Fifth Amendment right to be free from the deprivation of liberty without due process of law. Count three alleges that the defendants' actions constituted an unlawful search and seizure within the meaning of the Fourth Amendment. The remaining causes of action assert pendent state law claims for battery, assault, intentional infliction of emotional distress, violation of the Ralph Civil Rights Act, Cal.Civ.Code § 51.7, and negligence.

The defendants now move to dismiss the complaint. They argue that (1) *Bivens* is inapplicable to the present case; (2) the defendants, as government officials, have qualified immunity against the plaintiffs' *Bivens* actions; (3) the complaint does not contain specific factual allegations that the defendants acted with unlawful intent; and (4) the defendants, as federal employees, are absolutely immune from the plaintiffs' state law claims. The defendants have also moved to strike certain language from the complaint.

## ALLEGATIONS

For the purposes of these motions, the factual allegations in the plaintiffs' complaint must be taken as true. The complaint alleges that there has been a long history of demonstrations at the weapons station. Since January of 1986, protesters have been in the habit of notifying authorities at the station of planned protests. On August 21, 1987, plaintiff Willson sent a letter to defendant Cagle notifying him that protesters planned to conduct a forty-day fast on the tracks outside the station. It was anticipated that any protester who attempted to block the passage of a train would be arrested and removed from the tracks. *See* Complaint ¶¶ 19–21.

Defendant Cagle forwarded copies of Willson's letter to defendants Banta and Ching. Despite knowledge of the plaintiff's intention to obstruct the passage of trains, defendants Cagle, Banta, and Ching allegedly failed to prepare plans for the safe passage of trains, and allegedly failed to instruct defendants Hubbard, Humiston, Dawson, and Mayfield on how to proceed in the event that protesters attempted to block the train. Defendant Banta did contact the Contra Costa County Sheriff's Office and agree to give the Sheriff one half-hour notice of train movements so that the Sheriff could arrest demonstrators and remove them from the tracks. However, this alleged agreement was not kept. *See* Complaint ¶¶ 22–24.

The complaint contains the following account of the events of September 1, 1987:

26. ... at approximately 11.40 a.m., Plaintiffs and other protesters gave additional notice to Concord Naval Weapons Station personnel of the plan to blockade the loaded munitions train which was waiting, stationary, behind the Inland Gate of the Concord Naval Weapons Station. A delegation of demonstrators headed to the main gate of the Weapons Station while Plaintiffs Willson, Duncombe, and Murphy took their places on the railroad tracks in front of the large banner which was stretched across the tracks. Plaintiff Kroll stood next to the tracks, holding up the banner.

27. While Plaintiffs were assembling on the railroad tracks, the delegation of demonstrators reached the security office near the Inland Gate and approached MAC McAlpin, the Chief Master–At–Arms, who was stationed inside. They handed her a copy of Plaintiff Willson's August 21, 1987 letter, and informed her that demonstrators were sitting on the tracks and intended to block the train which was waiting behind the gate, and that they did not intend to move from the tracks. McAlpin immediately delivered this letter to Defendant Banta and told

Banta that the demonstrators intended to block the train. The delegation of demonstrators then approached Defendant Hubbard, who was standing near the gate and holding a two-way radio. They informed Defendant Hubbard that demonstrators were on the tracks and intended to block the train. The delegation of demonstrators then gave the same message to a group of United States Marine Corps guards who were seated in a van near the Gate.

28. Despite notice that demonstrators were seated on the tracks and intended to block passage of the train, and despite the fact that a large group of protesters, including Plaintiffs, were grouped on and near the tracks with a large blue banner stretched across the tracks, in clear view of Defendants Banta, Hubbard, Dawson, Humiston, and Mayfield, said defendants caused the loaded munitions train to proceed across Port Chicago Highway into the group of protesters. The speed limit at the area where the collision occurred is 5 M.P.H. Defendants operated the train at approximately 16 M.P.H. at the time of the incident. Defendants made no attempt to arrest or remove Plaintiffs from the tracks, and made no effort to warn Plaintiffs or any other protesters, that the train would not stop for the demonstrators. Instead, they caused the train to proceed toward the demonstrators at a speed far in excess of the speed limit. As the train crossed Port Chicago Highway, Plaintiff Rauen waved her arms and shouted to Defendants Dawson, Mayfield, and Humiston to stop the train. Both the demonstrators and their banner stretched across the tracks were clearly and continuously visible to the train crew from a distance in excess of 500 feet before impact. Said Defendants, nevertheless, made no effort whatever to slow or stop the train until after it struck and ran over Plaintiff Willson.

Complaint ¶¶ 26–28. The complaint goes on to describe the injuries sustained by the plaintiffs as a result of the collision. The most serious injuries were sustained by plaintiff Willson, who lost both his legs as a result of the collision. *See* Complaint ¶¶ 29–34.

## DISCUSSION

In order to prevail on their motions, the defendants bear the burden of demonstrating "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). The facts alleged in the complaint, and set forth above, must be considered true for the purposes of these motions, and the complaint must be read in the light most favorable to the plaintiffs. *See Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). The plaintiffs are not required to plead their evidence or set forth "specific factual details not ascertainable in advance of discovery." *Gibson*, 781 F.2d at 1340. In determining whether the defendants have carried their burden, we first examine the plaintiffs' *Bivens* claims, and then turn to the plaintiffs' state law claims.

### 1) Availability of Relief Under Bivens

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court held that people whose constitutional rights are violated by federal agents may sue the wrongdoers in their individual capacities. The Court cautioned that such a remedy should not be made available if there were "special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 396, 91 S.Ct. at 2004. Although *Bivens* itself dealt only with Fourth Amendment violations, the *Bivens* doctrine has subsequently been extended to cases arising under the Due Process Clause of the Fifth Amendment, *see Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the First Amendment. *See Gibson*, 781 F.2d at 1342.

The defendants argue that special factors exist that counsel against allowing a *Bivens* remedy in this case. In support of this claim, the defendants cite two lines of authority that have carved out exceptions to the *Bivens* rule. First, the defendants claim that a *Bivens* remedy is inappropriate under the recent decision in *Schweiker v. Chilicky,* —— U.S. ——, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). In *Schweiker,* the Supreme Court refused to allow a *Bivens* suit against federal officials who had allegedly adopted unconstitutional administrative policies that lead to the improper termination of the plaintiffs' social security benefits. The Court held that the plaintiffs' sole remedy was provided by the "elaborate" scheme for administrative and judicial review of termination decisions. This scheme provided for the retroactive restoration of improperly-withheld benefits, but it did not provide damages for emotional distress suffered because of the improper termination of benefits. The Court concluded that, in light of the remedy expressly provided by Congress, it would be inappropriate to create a cause of action against the individual federal officials responsible for the termination decisions. "When the design of a government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." *Id.* 108 S.Ct. at 2468. Similarly, in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the Court refused to recognize *Bivens* claims brought by federal employees for wrongful termination or demotion, because Congress had already provided a comprehensive remedial scheme to compensate civil servants for improper employment actions taken by their supervisors.

The defendants seek to draw an analogy between the facts of the present case and those of *Schweiker* and *Bush.* The analogy is not very apt. Unlike the decisions made by the defendants in *Schweiker* and *Bush,* the decisions made by the present defendants regarding the movement of trains were not subject to any direct scheme of administrative or judicial review. Thus it cannot be said that Congress has provided an adequate alternative remedy which precludes plaintiffs' *Bivens* claim. The suggestion that the Federal Tort Claims Act is such a remedy has already been rejected by the Supreme Court. *See Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Accordingly, we conclude that the *Schweiker* decision provides no basis for dismissing the plaintiffs' *Bivens* claims.

The second line of cases cited by the defendants deals with *Bivens* actions brought by military personnel. *See United States v. Stanley,* 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). These cases recognize an exception to the *Bivens* doctrine analogous to the *Feres* exception to the Federal Tort Claims Act, which is to say that they do not allow military personnel to bring *Bivens* actions for injuries arising out of activity incident to military service. At oral argument, counsel for defendant Cagle claimed that these cases stood for the proposition that *Bivens* actions could not be brought *against* members of the military for actions taken in the line of duty: *"Bivens* may have ruled when dealing with law enforcement officials, the FBI conducting warrantless searches, but it doesn't have rule with the military." *See* Transcript of Oral Argument at 45.

Even a cursory reading of the *Stanley* and *Chappell* opinions indicates that they are inapplicable to the present case, for the simple reason that the plaintiffs in this case are civilians rather than members of the military. In setting forth the rationale for the *Chappell* decision, the Court noted that:

> The special nature of military life—the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel— would be undermined by a judicially created remedy exposing officers to personal liability *at the hands of those they are charged to command.* Here, as in *Feres,* we must be "concern[ed] with the

disruption of '[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his superiors into court." *Stencel Aero Engineering Corp. v. United States*, 431 U.S. [666] at 676 [97 S.Ct. 2054 at 2060, 52 L.Ed.2d 665] (Marshall, J., dissenting), quoting *United States v. Brown*, 348 U.S. [110] at 112 [75 S.Ct. 141 at 143, 99 L.Ed. 139.]

Also, Congress, the constitutionally authorized source of authority over the military system of justice, has not provided a damages remedy for claims by military personnel that constitutional rights have been violated by superior officers. Any action to provide a judicial response by way of such a remedy would be plainly inconsistent with Congress' authority in this field.

Taken together, the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute "special factors" which dictate that it would be inappropriate to provide *enlisted military personnel* a *Bivens*-type remedy against their superior officers. *Chappell*, 462 U.S. at 304, 103 S.Ct. at 2367 (emphasis added). The *Stanley* and *Chappell* opinions nowhere suggest that a *Bivens* action cannot be maintained *against* a military officer whose unconstitutional domestic activities cause injury to civilians. The rationale of those cases does not support the startling proposition that, when dealing with civilians, military officers should be altogether excused from conforming their behavior to the dictates of the Constitution. Such an extension of the *Stanley* and *Chappell* decisions would be inimical to a legal system based on constitutional, rather than martial, law. Defendant Cagle's argument must therefore be rejected.

### 2) Qualified Immunity from Bivens Claims

Having concluded that a *Bivens* action may potentially lie against military officers and civilian employees of the military, we turn to the question of whether the individual defendants are immune from liability under the circumstances of this case. In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court announced the following rule concerning the qualified immunity of government officials from damage actions: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Under *Harlow*, the pivotal question raised by defendants' motions is whether the *alleged* acts of the defendants, viewed objectively, violated clearly-established constitutional rights.

The activities of the several defendants which allegedly form the basis for liability can be grouped into three categories. In the order of decreasing causal proximity to the collision, these categories are: first, the activities of the five defendants who were present at the inland gate immediately before the train departed; second, the alleged violation by each of the defendants of the agreement with the Sheriff's Department; and third, the alleged failure of defendants Cagle, Banta, and Ching to devise adequate plans for the safe operation of trains or to supervise the other defendants properly.

■ The first category of allegations concerns the activities of Defendants Banta, Hubbard, Dawson, Humiston, and Mayfield that immediately preceded the collision. According to the complaint, these five defendants caused the train to proceed across Port Chicago highway towards the demonstrators at three times the posted speed limit. This action was taken in spite of the fact that the defendants knew the protesters had positioned themselves on the tracks. No effort was made to have the protesters arrested or otherwise removed from the tracks, nor were any efforts made to slow the train as it approached the protesters and it became clearer that a collision was likely to occur. *See* Complaint ¶¶ 27–28. Thus the complaint alleges that these defendants simply started the train down the tracks and left the protesters to fend for themselves.

If these allegations are true, the above-named defendants clearly violated the constitutional rights of the plaintiffs. By sending the train down the tracks, rather than choosing a less dangerous method of removing the protesters from the tracks, the defendants violated the plaintiffs' rights to be free from the excessive use of force by government agents. This right is clearly established under the Fifth Amendment of the constitution, which prohibits the deprivation of life or liberty without due process of law. *See e.g., Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987); *Rutherford v. City of Berkeley*, 780 F.2d 1444 (9th Cir.1986).

Although the facts of this case are certainly novel, the legal principle involved is not. "[E]gregious government conduct in the form of excessive and brutal use of physical force constitutes a violation of substantive due process." *Smith*, 818 F.2d at 1417 (citing numerous cases). The line between permissible and excessive uses of force by government agents may not be precisely defined, but government conduct that "shocks the conscious" or "offend[s] even hardened sensibilities" clearly violates the Fifth Amendment. *See, e.g., Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). To provide guidance in applying the rather amorphous "shocks the conscious" standard, the Ninth Circuit has held that:

> in determining whether the constitutional line has been crossed, a court must look to such factors as [1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of the injury inflicted, and [4] whether force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Rutherford v. City of Berkeley*, 780 F.2d 1444, 1446 (9th Cir.1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). On the facts as they are alleged herein, the need for the application of any substantial force was minimal, because the plaintiffs were prepared to be arrested and removed from the tracks. *See* Complaint ¶ 20. Because arrest and removal was quite plainly a viable option, no reasonable relationship existed between the need to remove the plaintiffs and the amount of force applied to accomplish that objective. The defendants' actions created an obvious potential for the infliction of serious injury and, sadly, that potential was realized. While there is no allegation that the defendants acted "sadistically for the very purpose of causing harm," neither does it appear that the defendants' actions were necessary to maintain or restore order. Thus, an analysis of the factors identified in *Johnson* confirms our conclusion that the alleged activities of the defendants clearly crossed the line drawn by the Fifth Amendment.

We recognize that the above-quoted test is borrowed from the specialized context of prison guard or police brutality cases. Such cases generally involve straight-forward allegations that the defendant assaulted the plaintiff with intent to cause harm. The present case is somewhat different, as the complaint contains both allegations that the defendants acted with the intent to cause harm and allegations that they acted with "conscious disregard for, and indifference to the rights and safety of Plaintiffs." *See, e.g.,* Complaint ¶ 38. Although the fourth component of the *Johnson* test does not appear to be directly applicable to claims based on conscious indifference, the other three components still provide powerful indications that the alleged use of force in this case was excessive.

The Ninth Circuit has recently reaffirmed the established principle that allegations of conscious disregard for a plaintiff's safety can be sufficient to overcome claims of qualified immunity. *See Estate of Conners v. O'Connor*, 846 F.2d 1205, 1208 (9th Cir.1988) (state hospital administrators' "official indifference" to constitutional right of patient to be free from attacks by other patients could defeat immunity); *see also Wood v. Ostrander*, 851 F.2d 1212 (9th Cir.1988) (No immunity for

police officer who had stranded the plaintiff in a high crime area late at night after arresting her companion, because the officer's action demonstrated "callous disregard" for plaintiff's liberty interest in physical security).[1]  Under this principle, it clearly was not constitutionally permissible for officers of the federal government to send a train down the tracks at the protesters, with studied indifference to the consequences that their actions would have on the protesters.  These actions had the foreseeable result of violating the plaintiffs' Fifth Amendment right not to be deprived of liberty without due process of law, as well as their First Amendment right to conduct a political demonstration.  Assuming that the plaintiffs can produce facts in support of their allegations, it would not be unreasonable for "a jury to find that [the defendants'] alleged conduct 'shocks the conscience,' and thereby crosses the line into a deprivation of substantive due process."  *Wood*, 851 F.2d at 1216.  Because the actions allegedly taken by defendants Banta, Hubbard, Dawson, Humiston, and Mayfield clearly violated federally-protected rights, these defendants are not entitled to qualified immunity from the plaintiffs' *Bivens* actions.

■  For the purposes of the qualified immunity inquiry, defendants Cagle and Ching stand in a different position than the other five defendants.  The allegations concerning the events that immediately preceded the collision, discussed above, are leveled only against defendants Banta, Hubbard, Dawson, Humiston, and Mayfield.  The complaint does not allege that defendants Cagle and Ching were involved in these events or that they "caused the loaded munitions train to proceed across Port Chicago Highway into the group of protesters."  Complaint ¶ 28.  Rather, defendants Cagle and Ching are alleged to have participated in the events of September 1, 1987 only by way of the second category of activities listed above—i.e., through their alleged violation, along with each of the other defendants, of the agreement with the Sheriff's Department to provide thirty minutes notice of all train movements.

Defendants Cagle and Ching argue that this second category of allegations does not establish a causal connection between their conduct and the plaintiffs' injuries sufficient to overcome the defense of qualified immunity.  In cases involving supervisory liability, "[t]he required causal connection between supervisor conduct and the deprivation of a constitutional right is established either by direct personal participation or by setting in motion a 'series of acts by others which the [supervisor] knows or reasonably should know would cause others to inflict constitutional injury.'"  *Bergquist v. County of Cochise*, 806 F.2d 1364, 1370 (9th Cir.1986) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir.1978)).

The plaintiffs argue that the requisite causal connection is alleged in paragraph 24 of the complaint.  After stating that defendants Cagle and Ching were informed of the plaintiffs' plans to block the tracks, the complaint alleges that:

> After receiving Plaintiff Willson's letter notifying Defendants of the blockade of trains, Defendant Banta contacted the Contra Costa County Sheriff's Office and agreed to give the Sheriff one-half hour notice of train movements so that the Sheriff could arrive and make arrests.  This arrangement was communicated to *each* of the named Defendants.  On September 1, 1987 the Defendants, *and each of them*, violated this agreement, driving the train into the protesters without giving the Sheriff adequate notice and before the Sheriff's deputies could arrive.

Complaint ¶ 24 (emphasis added).  When read in the context of the complaint as a whole, this paragraph obviously does not mean to suggest that defendants Cagle and Ching directly participated in the sense that they helped drive the train at the

---

**1.** These cases both dealt with state officials sued under 42 U.S.C. § 1983, rather that federal officials sued under *Bivens*.  However, the same qualified immunity standard applies in both contexts.  *See Butz v. Economou*, 438 U.S. 478, 486 & n. 9, 98 S.Ct. 2894, 2900 & n. 9, 57 L.Ed.2d 895 (1978).

protesters. The plaintiffs argue, however, that this paragraph clearly does allege that on the date of the incident defendants Cagle and Ching, acting in concert with the other defendants, decided that the train should depart without providing adequate notice to the Sheriff's department, thus depriving the Sheriff of the opportunity to arrest the protesters and remove them from the tracks.

The conclusory allegation that "the Defendants, and each of them" violated the agreement with the Sheriff is not sufficient to overcome the qualified immunity of defendants Cagle and Ching. Except for this single indirect reference, the paragraphs of the complaint dealing with the events of September 1, 1987, nowhere mention defendant Cagle or defendant Ching. *See* Complaint ¶¶ 24–29. Thus the current complaint does not sufficiently set forth the manner in which defendants cagle and Ching are alleged to have directly participated in the events on the day of the incident and to have violated the agreement with the Sheriff. Accordingly, the motions to dismiss brought by defendants Cagle and Ching will be granted.

At oral argument, the plaintiffs requested leave to amend their complaint to set forth more explicitly the basis of liability against defendants Cagle and Ching, in the event that the court should conclude that the allegations of paragraph 24 did not establish a sufficient causal nexus. *See* Transcript of Oral Argument at 40. Because we conclude that the allegations of paragraph 24 are not legally sufficient, the plaintiffs will be given thirty days to file an amended complaint that sets forth more fully the facts allegedly giving rise to liability against defendants Cagle and Ching.[2]

■ The third and final category of allegations contained in the complaint concerns the alleged failure by defendants Cagle, Banta, and Ching to adopt plans adequate to ensure the safety of the plaintiffs. Standing alone, these allegations would not be sufficient to overcome the defendants' assertions of qualified immunity. When viewed prospectively, the failure of these three defendants to promulgate a formal plan to deal with the impending demonstration, without more, cannot be said to have been a clear violation of the rights of the plaintiffs. The most that the complaint alleges in this respect is that defendants Cagle, Banta, and Ching did not react with sufficient foresight when they were notified of the protesters' intent to blockade trains, because they did not develop or implement plans sufficient to prevent the tragedy that occurred. In the clear light of hindsight, these alleged failures on the part of these three defendants might be regarded as serious errors of judgment. They do not, however, rise to the level of a constitutional violation.

In summary, the plaintiffs have asserted facts that, if proven, are sufficient to demonstrate that their constitutional rights were clearly violated. They have also alleged facts sufficient to show that defendants Banta, Hubbard, Dawson, Humiston, and Mayfield played a direct role in the alleged violation. The assertion of quali-

---

**2.** At oral argument, counsel for plaintiff Willson made the following factual assertions against defendants Cagle and Ching:

These supervisors know in advance that there are going to be human beings on railroad tracks in the path of oncoming trains. They know that 10 days in advance. They know that again because, for an hour and a half prior to this incident, on the morning of the incident, the plaintiffs are there blocking the tracks prior to the arrival of the train. They have a banner stretched across the railroad tracks and they're gathered in front of that banner in full view of five of the defendants, and that's alleged in the complaint.

In this case, knowing these things, the supervisors made one plan to deal with this incident. That one plan was to call the Contra Costa County Sheriff and to have him come and arrest the demonstrators and remove them from the railroad tracks so that the train could proceed safely through the area of the incident.

Then the supervisors agreed to violate that one plan, the only plan they made to deal with this incident, and to send the train speeding through there without removing the protesters from the tracks and without arresting them. That is the personal participation of the supervisors which establishes an affirmative link between their own conduct and the constitutional harm that resulted here. Transcript of Oral Argument at 24–25.

fied immunity by these defendants must therefore be rejected. The present complaint, however, does not contain allegations sufficient to demonstrate that defendants Cagle and Ching played a direct role in the incident. The motions of defendants Cagle and Ching are therefore granted, and the plaintiffs are hereby given leave to file an amended complaint within thirty days of the date of this order. Finally, we reject with prejudice the plaintiffs' suggestion that defendants Cagle, Banta, and Ching may be held liable under *Bivens* merely for their alleged failure to adopt plans adequate to prevent the collision.

### 3) Pleading Requirements

In addition to arguing that they are entitled to qualified immunity under the *Harlow* test, the defendants contend that the complaint is inadequate under the rule of *Gutierrez v. Municipal Court*, 838 F.2d 1031 (9th Cir.1988). Indeed, this is the only argument advanced by defendants Banta, Dawson, Humiston, and Mayfield for the dismissal of plaintiffs' *Bivens* claims. In *Gutierrez*, the Ninth Circuit stated that where allegations of improper motive are an essential element of a claim, "in order to survive a motion to dismiss, plaintiffs must state in their complaint nonconclusory allegations setting forth evidence of unlawful intent." *Id.* at 1052.

In order to understand the scope of the *Gutierrez* rule, it is necessary briefly to review the evolution of the law of qualified immunity. Prior to the adoption of an objective test for qualified immunity in *Harlow,* an official was not entitled to qualified immunity if it were alleged *either* that the official should have known that his actions violated federally-protected rights *or* that he took the action with a "malicious intention to cause a deprivation of constitutional rights or other injury." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). The *Harlow* Court decided that the qualified immunity standard utilized in *Wood* was inadequate, because the independent subjective element of the test allowed plaintiffs to proceed to trial on bare allegations that otherwise permissible official action was maliciously mo-

tivated. In order to prevent such fishing expeditions into the motivation behind otherwise permissible government action, *Harlow* redefined the qualified immunity doctrine to focus on the question of whether official action violated clearly established constitutional rights.

Application of the *Harlow* test has proved to be difficult in cases where the existence of a constitutional violation by definition depends on the motivation of the government official. *See generally,* Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation,* 95 Yale L.J. 126 (1985). For example, it is not a violation of the constitution for a government official to fire a black employee, but it most assuredly is a violation of clearly established federal rights to fire an employee *because* he is black. "The act itself—the act of discharge—is neutral; it is the motive or intent that makes the act both actionable and violative of clearly established law." *Gutierrez,* 838 F.2d at 1050. Clearly the *Harlow* Court did not mean to insulate officials from liability in every case where the official's state of mind was an essential element of the alleged constitutional violation. *See Martin v. D.C. Metropolitan Police Department,* 812 F.2d 1425, 1433 (D.C.Cir.1987), *vacated in part,* 817 F.2d 144 (D.C.Cir.1987) (en banc). Just as clearly, however, the *Harlow* Court did mean to protect officials in situations where plaintiffs merely "allege facts demonstrating that defendants have acted lawfully, append a claim that they did so with an unconstitutional motive, and as a consequence usher defendants into discovery, and perhaps trial, with no hope of success on the merits." *Hobson v. Wilson,* 737 F.2d 1, 29 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).

The requirement that plaintiffs set forth nonconclusory allegations of unlawful motivation was adopted by the *Hobson* and *Gutierrez* courts in response to this dilemma. A close reading of those opinions demonstrates that the special pleading requirements apply only where an allega-

tion of improper motive is an essential element of the alleged constitutional violation. In other words, if the challenged conduct would not violate clearly established constitutional rights but for the existence of an impermissible motive, a plaintiff must set forth with particularity the evidence upon which he bases his allegations of improper motive.

The facts of *Gutierrez* are instructive. In that case, a state court employee brought a section 1983 suit against several municipal judges who had imposed an English-only rule in court offices. The Ninth Circuit upheld the issuance of a preliminary injunction against the enforcement of the English-only rule, finding that the rule was not justified by business necessity. *See Gutierrez*, 838 F.2d at 1041–45. The Ninth Circuit concluded, however, that the law regarding the invalidity of English-only rules was not clearly established at the time the rule was adopted. Thus the defendants would be immune from damages unless the plaintiff could establish that the defendants "imposed the rule *for the purpose and with the intent of* discriminating against Hispanics." *Id.* at 1049. Such purposeful discrimination would be a violation of clearly established law. The Ninth Circuit remanded the case so that the district court could determine whether the plaintiff had or could state sufficient nonconclusory allegations of intentional discrimination.

■ A crucial step in the analysis of the *Gutierrez* opinion—and one that is largely ignored by the defendants—was the determination that the judges had not committed a *per se* violation of the plaintiff's clearly-established constitutional rights by adopting the English-only rule. Thus in order to

overcome the qualified immunity defense, it was essential that the plaintiff plead and prove purposeful discrimination. No reason exists for the *Gutierrez* rule to apply to a case in which an allegation of improper motivation is *not* an essential element of the constitutional violation. This is such a case. As was discussed above, the defendants' decision to send the train down the tracks towards the protesters was a violation of clearly established constitutional norms, regardless of whether that decision was motivated by animosity towards the protesters or simply by a desire to make the trains run on time.

Moreover, the complaint would not be inadequate even if it were judged under the *Gutierrez* rule. The complaint is quite detailed, and does not merely set forth conclusory allegations of unlawful motivation. While the plaintiffs do not allege any direct evidence of unlawful motivation, it will be a rare case indeed in which government officials will make such evidence available by announcing their intent to act unlawfully. Normally, the existence of unlawful motivation will have to be inferred from the conduct of the officials. We do not say that such an inference is necessarily justified in this case. However, the facts alleged in the complaint—most particularly the failure of the defendants to remove the plaintiffs from the tracks peaceably, the excessive speed at which the train is alleged to have traveled, and the failure of the train crew to take any action to slow the train even when a collision appeared imminent—could lead a reasonable jury to infer that the defendants had acted with an unlawful motivation.[3] Certainly the allega-

3. From the facts alleged in the complaint, a reasonable jury might conceivably infer that the defendants actually intended to harm the plaintiffs. The defendants' arguments to the contrary notwithstanding, however, such a strong showing of unlawful motivation is not required for the plaintiffs to establish a *Bivens* claim. As is discussed above, it is enough that the defendants allegedly acted with callous disregard for the rights of the plaintiffs. Although the defendants cannot be held liable under *Bivens* for injuries inflicted accidentally through behavior that was merely negligent, the defendants can be held liable for injuries resulting from their

callous disregard for the plaintiffs' safety, even if the defendants did not actually intend to injure the plaintiffs. This point was eloquently made in *Dandridge v. Police Department of Richmond,* 566 F.Supp. 152 (E.D.Va.1983):

If [a police] officer accidentally ran into a march of peaceful protesters, mangling and killing several, his careless driving alone would amount to no more than a State tort. If, however, he swerved to frighten the protestors [sic], of whom he disapproved, his accidental bruising of even one makes out a First Amendment violation under § 1983, being the natural result of an unconstitutional intent.

tions in the complaint satisfy the purpose underlying the requirement of particularized pleading, in that they are "sufficiently precise to put defendants on notice of the nature of the claim and enable them to prepare a response...." *Hobson*, 737 F.2d at 29.

### 4) Absolute Immunity from State Law Claims

■ The defendants' next contention is that, as federal employees, they are all absolutely immune from the plaintiffs' state law causes of action. As a unanimous Supreme Court recently announced, "conduct by federal officials must be discretionary in nature, as well as being within the scope of their employment, before the conduct is absolutely immune from state-law tort liability." *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 583, 98 L.Ed.2d 619 (1988). The Court went on to note that absolute official immunity can be provided only at a great cost:

> An injured party with an otherwise meritorious tort claim is denied compensation simply because he had the misfortune to be injured by a federal official. Moreover, absolute immunity contravenes the basic tenant that individuals be held accountable for their wrongful conduct. We therefore have held that absolute immunity for federal officials is justified only when "the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens."

*Id.* (quoting *Doe v. McMillan*, 412 U.S. 306, 320, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973)). Thus in order to establish that they are absolutely immune from the plaintiffs' state law tort claims, the defendants must establish (1) that they were acting within the outer perimeter of their duties, (2) that their actions were discretionary, and (3) that in the particular context of this case, the benefits of immunity in terms of promoting effective government decision-making outweigh the costs imposed on vic-

tims. The defendants have the burden on the issue of immunity. *Id.* 108 S.Ct. at 585.

The defendants have satisfied the first prong of the inquiry. The activities of defendants Cagle, Banta, and Ching in adopting, or failing to adopt, plans for dealing with the protest fell within the core of their official duties. The issue is not as clear cut with respect to the activities of each defendant in violating the agreement with the Sheriff's Department, and the activities of defendants Banta, Hubbard, Dawson, Humiston, and Mayfield in causing the train to proceed towards the demonstrators. Nevertheless, it appears that these activities fell within the outer perimeter of the defendants' duties.

The plaintiffs point to cases which hold that the commission of an intentional tort by a federal official is necessarily outside the scope of his employment. *See Arnold v. United States*, 816 F.2d 1306 (9th Cir. 1987) (sexual harassment); *McKinney v. Whitfield*, 736 F.2d 766 (D.C.Cir.1984) (assault and battery). We quite agree that the commission of an intentional tort that is unrelated to a federal official's duties is beyond even the outer perimeter of the scope of employment. Thus if the defendants had engaged in fist fights with the protesters, they would not be immune from state tort liability. However, the battery that occurred in this case, if any, was related to the defendants' duties in that it resulted from the operation of the train by the defendants. That is sufficient to bring the defendants' actions within the outer perimeter of their duties. *See Augustine v. McDonald*, 770 F.2d 1442, 1446 (9th Cir. 1985) (official action is within outer perimeter of duty if it bears "some reasonable relation to and connection with the duties and responsibilities of the official").

The second prong of the *Westfall* test is difficult to apply, as there is no clear test for deciding when an official's action is discretionary. Rather, courts engage in an *ad hoc* inquiry into the degree of discretion

---

*Id.* at 160 (citations omitted). Specific intent to injure is not required. "The touchstone is merely a general intent to infringe the exercise of a specific constitutional right. The actual depri-

vation may be a step removed, namely the natural consequence of an intentional action." *Id.* at 161.

exercised by a given official in a given situation. The *Westfall* opinion itself did not purport to determine "the level of discretion required before immunity may attach." *Westfall*, 108 S.Ct. at 585. It did, however, reject the expansive view of qualified immunity that would consider all acts discretionary unless they were mandated by law. *See id.* at 584–85. Furthermore, the *Westfall* Court admonished lower courts carefully to consider "whether the contribution to effective Government in particular contexts outweighs the potential harm to individual citizens." *Id.* at 585.

The case law concerning the definition of a discretionary function is not entirely consistent. In determining whether a given act is discretionary, however, courts generally distinguish between actions based on considerations of public policy and actions of an "operational" nature. The former type of acts are properly considered discretionary. *Cf. Berkovitz v. United States*, — U.S. —, —, 108 S.Ct. 1954, 1957, 100 L.Ed.2d 531 (1988) (defining discretionary acts, in the context of the discretionary function exception to the Federal Tort Claims Act, as those involving the permissible exercise of policy judgment). The latter are not. For example, the Eleventh Circuit has held that qualified immunity does not bar a suit by a federal employee against his supervisors for failing to provide a safe work place environment.

[N]ot every act which might literally be termed "discretionary" is sufficient to invoke the immunity doctrine. Indeed, "[i]n the strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion." To prevent the discretionary function requirement from being rendered meaningless, we have held that official immunity may be extended only to those acts of federal employees involving planning or policy considerations. Where, on the other hand, the acts in question concern day-to-day operations, official immunity is not available.

.... Where, as here, the acts of federal employees have no noticeable implications for government policy, those employees are no more entitled to be free from responsibility for their acts than are employees in the private sector.

*Franks v. Bolden*, 774 F.2d 1552, 1555 (11th Cir.1985) (citations omitted) (quoting *Johns v. Pettibone Corp.*, 769 F.2d 724, 728 (11th Cir.1985)); *see also Chavez v. Singer*, 698 F.2d 420 (10th Cir.1983) (defendant with no policy making authority not immune, even though he had "operational control" at scene of accident); *Jackson v. Kelly*, 557 F.2d 735 (10th Cir.1977) (action not discretionary if it involves the enforcement of a mandatory duty at the operational level, even if professional expert evaluation is required).

Under this standard, the alleged failure of defendants Cagle, Banta, and Ching to establish plans adequate to prevent the collision can properly be classified as a discretionary activity. The promulgation of a generalized plan for dealing with demonstrations would clearly involve the balancing of competing policy interests. The failure to do so is likewise a policy determination of a sort. Accordingly, we conclude that defendants Cagle, Banta, and Ching have absolute immunity from plaintiffs' claim that they negligently failed to adopt policies sufficient to prevent a collision.

The activities of the defendants that took place on September 1, 1987, were operational in nature, and hence cannot properly be considered discretionary acts. The decision to send the train down the track without providing adequate notice to the Sheriff's Department was not based on any broad public policy considerations—rather, it represented an operational judgment concerning the most expedient method of dealing with the protesters.[4] The activities of

---

4. The plaintiffs contend that defendants Cagle and Ching participated in making this decision. To the extent that they did, they were engaging in an operational activity, rather than a discretionary one. However, as is discussed above, the present complaint does not sufficiently set forth the manner in which defendants Cagle and Ching participated in the events of September first. Accordingly, the plaintiffs' state law claims against defendants Cagle and Ching are

defendants Banta, Hubbard, Dawson, Humiston, and Mayfield in allegedly carrying out this decision were also operational in nature. We therefore conclude that the activities allegedly engaged in on September 1, 1987, by the defendants were not sufficiently discretionary to warrant absolute immunity from the plaintiffs' state law claims.[5]

The above conclusions are bolstered by an analysis of the third component of the *Westfall* test. In promulgating regulations or plans of general application, federal employees such as defendants Cagle, Banta, and Ching may well need the protection of absolute immunity in order effectively to carry out their governmental duties. The failure to promulgate adequate regulations, without more, will not create any immediate harm to citizens. The balancing test set forth in *Westfall* thus tilts against the plaintiffs on their claim that defendants Cagle, Banta, and Ching should be held liable for their allegedly inadequate planning. However, the balance tilts in the opposite direction when the events of September 1, 1987, are considered. It is difficult to see how granting absolute immunity for the defendants' operational decisions concerning the dispatching of trains is necessary to promote the effective functioning of government. On the other side of the balance rests the serious potential for uncompensated harm resulting from the improper operation of trains by government employees. Under these circumstances, the *Westfall* test compels the conclusion that the assertion of absolute immunity by defendants Banta, Hubbard, Dawson, Humiston, and Mayfield should be denied. The motions to dismiss by defendants Cagle and Ching will be granted, because the complaint does not sufficiently allege that defendants Cagle and Ching played a direct role in making these operational decisions.

However, the plaintiffs will be given thirty days leave to amend their complaint to cure this defect.

### 5) Motions to Strike

Defendant Banta has moved to strike allegations in the complaint that the defendants acted recklessly or with gross negligence. According to Defendant Banta, these allegations are irrelevant because, in order to state a *Bivens* claim, the plaintiffs must allege that the defendants intentionally violated their clearly established rights. Defendants Dawson, Humiston, and Mayfield move to strike portions of the complaint which describe the history and purpose of demonstrations at the weapons station, and also the allegations in paragraph 29 of the complaint that "the train *barreled* through the area" where the protesters were, and that "plaintiff Duncombe leaped to his feet to *escape* the oncoming train."

■ Motions to strike are not favored, and should be denied "unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." 5 Wright & Miller, *Federal Practice & Procedure* § 1382, at 809–10 (1969). Viewed against this standard, the defendants motions must be denied. The exact nature of the intent element required to state a *Bivens* action under the unusual circumstances of this case is and presumably will remain a matter hotly disputed by the parties. It therefore cannot be said that the allegations of recklessness and gross negligence are necessarily irrelevant. Even if they do turn out to be irrelevant, denying defendant Banta's motion to strike will cause no prejudice to the defendants.

■ The motion to strike by defendants Dawson, Humiston, and Mayfield is even more clearly without merit. The history

---

dismissed, and the plaintiffs are hereby given leave to file an amended complaint within thirty days.

5. The fact that the defendants were not engaged in discretionary functions provides an additional ground for denying their assertion of qualified immunity from *Bivens* claims. Most cases applying the standard for qualified immunity announced in *Harlow v. Fitzgerald,* 457 U.S. 800,

102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), focus on the requirement that official action "not violate clearly established statutory or constitutional rights." *Id.* at 818, 102 S.Ct. at 2738. However, the *Harlow* opinion also clearly states that qualified immunity is available only to "government officials performing discretionary functions." *Id.*

and purpose of demonstrations at the weapons station is plainly relevant to the plaintiffs' First Amendment claim, and it also shows that the defendants were not novices at dealing with demonstrations. The allegations that the train "barreled" through the demonstrators, and that the demonstrators tried to "escape" from the oncoming train, are a reasonably accurate —albeit non-neutral—description of the incident. Such non-neutral allegations will invariably be found in pleadings. They represent good advocacy, and are not a proper basis for a motion to strike. Additionally, the motion to strike by defendants Dawson, Humiston, and Mayfield is untimely, as it was filed after those defendants filed their answers. *See Culinary & Service Employees Union v. Hawaii Employee Benefit Administration,* 688 F.2d 1228, 1232 (9th Cir.1982) ("The District court has authority under Rule 12(f) to strike a pleading, in whole or in part, only if a motion is made before the moving party has filed a responsive pleading, unless the court strikes the pleading of its own initiative or no responsive pleading is permitted."). Accordingly, these motions are denied.

## CONCLUSION

The plaintiffs' efforts to premise liability on the alleged failure of supervisory employees adequately to anticipate the tragic events of September 1, 1987, must be rejected. These planning activities were discretionary functions within the scope of the duties of the supervisors. The alleged failure to plan did not clearly violate the constitutional rights of the plaintiffs, nor did it directly cause the injuries of which they complain. This claim is therefore dismissed with prejudice.

The present complaint does not adequately set forth a direct link between the actions of defendants Cagle and Ching and the alleged violation of the plaintiffs' rights. The complaint against defendants Cagle and Ching will therefore be dismissed, with thirty days leave to amend.

The activities allegedly engaged in by defendants Banta, Hubbard, Dawson, Hu-

miston, and Mayfield on September 1, 1987, were operational in nature, and thus did not involve discretionary governmental functions. The complaint asserts that these defendants took actions that clearly violated the plaintiffs' First and Fifth Amendment rights. The motions to dismiss on grounds of absolute and qualified immunity brought by these defendants are therefore denied.

IT IS SO ORDERED.